May it please the Court. Good morning, Your Honors. My name is Stacey Grigsby. I represent the appellant here, Keri Borzilleri, in this appeal from the District of Maryland. Here, the question on the appeal is whether the District Court prematurely dismissed this case at the motion to dismiss phase to reach the sweeping conclusion that all Assistant States Attorneys in the State of Maryland may be fired for expressing support for a choosing candidate outside of work. Accepting the allegations in the complaint as true, which the Court was required to do, the District Court found Ms. Borzilleri's role as an alleged policymaker deprived her of the protections guaranteed by the First Amendment by both the free expression component and the free association component. This cannot and is not the law. First, as pled in the complaint... Let me ask you, if I'm correct in looking at the cases from other circuits, every circuit to have addressed this issue in the context of assistant prosecutor has found them to be a policymaker. Is there any circuit court of appeals that has decided to the contrary? No, Your Honor, there is not yet. However, it should... So you're hoping will be the first? It would be the first, but these cases are both distinguishable. And as we've noted in our brief, one thing that Branty tells us which dealt with public defenders is that it's important to do a case-specific and fact-specific inquiry and look at the employee's position and whether then you should determine whether it's a policymaker. For example... To follow up on Judge Agee's good questions, I went and read these cases, and I just want to read you a brief excerpt from them to show you how strong the law is against your position. This is from the Fifth Circuit. An assistant district attorney is vested with broad discretionary powers. The actions of an assistant district attorney by an estate. Assistant district attorneys are representatives of the district attorney, perform all the functions. It is therefore essential that the district attorney have trust and confidence in the assistant district attorney. The district attorney has a loyalty of the assistant district attorney. Then the Ninth Circuit says public agency would be unmanageable if its head had to retain its political enemies in positions of confidence or positions in which they would be exercising discretion in the implementation of policy. We hold that assistant district attorney Fazio was a policymaker. Then you have the Sixth Circuit in holding that the job of public defender is not a policymaking position. The Supreme Court noted that a public defender's responsibilities stand in contrast to the public defender's. We hold that the job of assistant prosecutor is a policymaking position. Then you have the Seventh Circuit. Public prosecutor such as the state's attorney exercises broad responsibilities in the performance of his duties. Prosecutor's client is not an individual but society as a whole. The prosecutor has broad discretion to set whatever policies he or she believes necessary to protect the interests of society. And then you have the Third Circuit that we reject appellant's contention that his function was purely technical and ministerial and therefore political affiliation would be an inappropriate criteria for employment. That an assistant district attorney could conceivably operate in a legal technical matter or that appellant's, in fact, so limited himself to that role described is irrelevant. So you have case after case after case from our sister circuits dealing with a broad variety of law. They've all reached the same holding. They've all reached the same conclusion. They've all employed parallel reasoning. Why should we go out on a limb and create a conflict? Well, here the question is actually a bit more narrow because one thing is all of those cases were actually decided past the motion to dismiss phase. I mean, all of these cases actually, almost all of them have distinctions. For example, when the Monks, the Sixth Circuit case and as well as the Third Circuit case, Momo versus Rank, there the courts found that the assistant district attorney or the assistant prosecutor could actually perform all functions by statute of the district attorney. And in fact, in the Pennsylvania statute, it said when the district attorney is incapacitated, then an assistant district attorney can perform all those functions. I mean, the Ninth Circuit reached the decision in Fazio where Fazio was quote unquote the head attorney. Fazio had supervisory responsibility and the record was extremely developed that he in fact spoke for the office. Well, of course, every office has a little wrinkle that may be different. But the commonalities of the position of an assistant district attorney or an assistant United States attorney would seem to far eclipse those. I mean, the AUSAs or assistant district attorneys, they decide what cases to investigate, which cases to charge, which cases to plead out, what the contours of a plea offer are, which cases to take to trial. Those are common responsibilities of district attorneys and of assistant district attorneys across the country. Your Honor, yes, but there are some variations and it should be noted that the largest group of prosecutors in the United States, which are the assistant U.S. attorneys and the Department of Justice trial attorneys, in fact, cannot be fired for political reasons. And interestingly, that is in part why in Brandy you have this dialogue between Justice Stewart and the majority there that say, by the majority, in the footnote which says, by the majority's, or the Stewart dissent which says, by the majority's reasoning, the United States attorney must be kept in office in between a change of administration. And the majority there says, well, no, we're not saying. But the cases that I've been reading, you've been state law cases and the federal circuits under L. Rod Brandy have held under all of these different state laws that this is a policymaking position. Again, I think the question for the court here is more narrow, which is on the pleading stage, which is not any of those cases, whether it is correct without doing any investigation for the court to hold what the responsibilities of hundreds of assistant state's attorneys in Maryland encompass. I mean, here, in fact, even the case Aquila, which both the court and Ms. Mosby note in the briefing, actually includes the language that the assistant state's attorneys act subject to the discretion and control of the state's attorney. There is no evidence here that they are subject to discretion. I mean, here, I don't think the personal liability is the test, is it? It's a question of the assistant district attorney making discretionary decisions that I would assume bind the state. If you agree, if an AUSA makes a call to plead a case and signs a plea agreement that binds the state, doesn't it? In that case, I mean, it could, the physical signature, but the question is whether the ASA is, in fact, acting totally unilaterally and has such discretion that they can decide to enter into a plea agreement. So a useful example is if the office has a ... Well, you're in the trial court and the charge is malicious wounding, a felony, and the prosecutor enters into a plea agreement and agrees to a plea, which the court accepts and enters, of assault and battery, a misdemeanor. The elected prosecutor cannot come back into court the next day and say, my assistant was without authority. The court's already entered the order. Isn't that correct? Yes, that's correct, Your Honor. We have more in this case by virtue of the plaintiff's own pleadings than you might have in a Garden Variety case. In paragraph 5 of her complaint, she alleges, your client alleges, she's one of the three community prosecutors and states that that serves as a liaison between the state's attorney's office, the community, and the local police. Then in paragraph 18, she alleges that she attended a number of community events because of her position as a community prosecutor. And as a community prosecutor, she often went to local events to represent the state's attorney's office. So by her own pleading, she seems to separate herself from perhaps the average line prosecutor to be someone who has even more responsibility, which would seem to augur for an even stronger finding that she was in a generic sense, a policymaker. I mean, again, this wasn't fully developed below. Yes, in the pleadings, the client was a community... But those are her own pleadings, and she can't rise above her own pleadings. But the pleadings also said that she never affected the policy orientation of the office. I mean, you can attend a community meeting and have interactions with the community just as the sheriff's deputies did in Bland, just as the jailer does in Knight v. Vernon. That does not necessarily mean that you are holding either more responsibility or that you're somehow more so an alter ego. I think, again, it's very case-specific and fact-specific. This court has held that just contact with the community is not enough. So, I mean, again, this is just unprecedented in the fact that it's in a very early stage. And just moving on, I think... Isn't it a matter of trust and loyalty and just the confidence in believing that people who are working in these very responsible positions actually have the team's interests at heart? And this was a very hard-fought election. And she was, as was her right, came out very publicly against this individual and for his opponent. And her views were on Facebook and she gave a talk and hosted a coffee and everything, which is fine. But at the same time, her candidate lost. And elections have to mean something. They have to mean something. And it would seem to me to be, if something were to happen, it would be somebody who was an avowed supporter of my political opponent, and his views of the office came in, it would concern me that that person was in a position of trust. Well, here, again, here, there are multiple levels in a state's attorney's office. So, there is the state's attorney. The state's attorney normally has three political deputies, as was understood. And in fact, now, in the organizational chart, there is a chief deputy who organizes the three deputies. And below that, there are units, or there were 16 units. And below that, there are assistant state's attorneys. And understanding that almost any person at any public office can somehow subvert what you're trying to do, the question is whether there's something by virtue of being an assistant state's attorney, as opposed to some other job, such as a jailer, that would mean that your political affiliation or political association. And here, just to be clear, the political association alleged is not that she explicitly criticized Ms. Mosby, but was rather that she supported the sitting state's attorney and talked about some of the accomplishments that he had during his tenure. But one thing that the court said in Elrod, which is important, it actually was asked, like one of the arguments was that someone who has a potentially different political affiliation or political association could undermine the entire process of the government. And the court said on page 364, more fundamentally, however, the argument does not succeed because it is doubtful that the mere difference of political persuasion motivates poor performance, nor do we think it's legitimately may be used as a basis for imputing such behavior. The political association is an adequate basis for imputing disposition of ill-willed conduct. And then they say to K.U. Sheehan, which is... Aren't a lot of these decisions, these discretionary decisions, policy-laden decisions? For example, some prosecutor's offices will put a premium on prosecuting police overreach. And other prosecutor's offices would put a premium on prosecuting judge drug cases. And others would put a premium on prosecuting pornography. Or others on white-collar crime. And that's a policy-laden decision, and that's only one. But there's an overall emphasis that the office is going to put on certain kinds of cases, and it's going to set priorities. And setting those priorities is a policy matter. And if you've got people who are adamantly opposed to the person that actually won the election, that can create managerial problems. Which is why, Your Honor, and I see I'm cutting into my rebuttal time, but it could... You can go on, because we've taken some of your time, so you feel free. Go ahead. But it, again, depends upon the position. I mean, just the idea that a trial attorney in the Department of Justice who is in pornography would not prosecute a case when the attorney general has said that there is an emphasis on prosecuting cases that meet certain criteria, I think to most of us is unthinkable, because prosecutors and line attorneys have a general duty. I mean, they have a general duty to perform their job and to implement policy. They're not making policy. Ms. Mosby, for example, could say, we need to prosecute everybody who has one ounce of marijuana on them. And all ASAs would have an understanding in that office that they need to fulfill that responsibility. They don't have discretion to not implement those policies. Well, but what you sketch is an ideal picture. And ideally, what you say is what we would like to happen. But in the practical world, people have their own ideas about what's important. And in both subtle and overt ways, those ideas come into play. I mean, I agree that's the way we would hope things would work. But after a hard-fought election, which leaves all kinds of ill feelings, and where your candidate lost and you were upset that the other person won, beat your favorite, that at least creates the potential for difficulties. Your Honor, understanding your position, again, I mean, these are all professionals. And in fact, as alleged in the complaint in the past, one, Patricia Jessame, lost to Greg Bernstein. And Ms. Mosby herself supported Patricia Jessame. She was allowed to stay an Assistant State's Attorney. And in fact, over 100 Assistant State's Attorneys stayed in the position and continued to perform their job under a different State's Attorney. And I'd like to reserve the rest of my time for rebuttal. You have some time for rebuttal as well. Oh, okay. So can I just keep going, or? We've taken some of your time. So if you want to make a concluding statement, you're certainly welcome to do so. Okay. Well, just separately, which we didn't address, the other error here, or there's two more errors, and one of which is that the Court did not perform a Pickering analysis, traditional Pickering analysis, but instead held that the political affiliation, political association claim was dispositive of Pickering. Based on the Supreme Court precedent on O'Hare and this Court's precedent, it is not the case that all speech, even by a policymaker, is decisive of the Pickering claim. They're interrelated, wouldn't you say, the Pickering claim and the L. Rod Bronte claim? Somewhat related, but again, there should be some kind of balancing, I mean... Well, in our cases, I thought they were pretty clear that said if the initial test is met and there's the finding of a policymaker or the equivalent, that does the Pickering balancing test. Well, Bland said that if there is a case where there was disloyalty, again, I mean, here we take issue with even the characterization that there's disloyalty, because if you look at the speech and the context in which it happened... If the initial step is reached and the L. Rod Bronte test is met and there's a policymaker or the equivalent determination, don't our cases say in that circumstance that the Pickering balancing test has been met? Well, so the language is from Bland, which says that there are certain positions, functions are such that party affiliation or political allegiance is an appropriate requirement for effective performance of the public office involved. Such employees may be terminated for speech constituting political disloyalty to their employer. So here, again, I mean, this case is a little bit different, at least in our view, because in terms of political disloyalty, Ms. Bozzoleri's speech was actually supportive of the sitting state's attorney. She could have been... According to this, I mean, you'd be in an almost impossible situation. If she had expressed support for Ms. Mosby, she could have been terminated back in the primaries. She actually expressed some support for her boss. There's no... Another question here that we haven't touched on, but I think is a federalism question here. I realize that you're arguing constitutional rights, but there does seem to me to be a caution flag in having federal courts really dictate to state local prosecutorial offices exactly how they should run their offices and what their personnel policies should be and the like. You know, we do still have a federal system, and there must be some limits to the ability of the federal courts just to jump in and tell a state district attorney or state prosecutorial office exactly how it's to manage its personnel policies. Just from a standpoint of the proper allocation of state and federal authority, that aspect of this case concerned me as it concerns the numerous other circuits that have refused to just wade in. Well, interestingly, in this case, there is a case, a state, a Maryland Court of Appeals case, Newell v. Reynolds, that dealt with the state's attorney's office. It was not a prosecutor, but a victims' rights advocate. And there, the Court of Appeals held that there was a valid First Amendment claim for dismissal based on political patronage and free expression. That may be the point. I mean, you know, the state judiciary doesn't have to be inert in these kinds of cases. And the question I think I'm asking is that, you know, given Maryland's sovereign interest in these kinds of matters, isn't it, it's not unfair to expect state courts, Maryland courts are very, very good, and it's not unfair to expect them to exercise a primary responsibility for the state's attorneys, district attorneys' offices within their own jurisdiction. All I'm saying is, you know, I just don't want to fall into the trap of saying that every conceivable problem out there is for a federal court to step in and rectify. That strikes me as getting the framers' constitutional structure out of balance. Yes, Your Honor. I mean, in some ways that ties into our third allegation of error, which is that the district court was in a better position to adjudicate one Maryland Declaration of Rights, Article 40 claim, but not the other. In some cases, that could be appropriate. Again, there is an idea that our federal courts have many more First Amendment cases, may be more familiar with the contours of— This wasn't a removed case, was it? You brought it in federal court. No, it was brought in federal court, an idea that would have an understanding of the contours of the First Amendment because of more familiarity and the application, but yes, I mean, parts of these claims could be brought in state court. Here we would say it's generally clear that this is something that—it doesn't appear that the Maryland legislature intended this result, and in fact, in Maryland statute, public employees have a guaranteed right to participate in the political process. That's stated as 3-204 of the Maryland Personnel and State Pension section. So I mean, here there's actually an expression by the Maryland legislature that public employees should not fear, at least outside of work. I mean, one condition is that it's outside of work, should not fear engaging in the political process. I mean, in that case, it seems that the proper test would be more of a pickering test for anybody who's not in a supervisory or real policymaking position because the questions as to whether it's disruptive, the questions as to whether, you know, the quality of the speech, whether it was pure campaign speech as— All right. We appreciate it. Okay. Thank you very much. Let me ask my colleagues if they have any further questions. Thank you so much. Thank you, Your Honor. May it please the Court. Every court of appeals to consider the question has determined that an assistant prosecutor qualifies as a policymaker. There you go. Qualifies as a policymaker under the Supreme Court's L. Rod Branty test. The same is true for assistant state's attorneys in Baltimore City. Like the deputy sheriff that this Court found to be policymakers in Jenkins, assistant state's attorneys may exercise the powers of an elected official here, the state's attorney. They play a special role in implementing the state's attorney's policies. They stand in the shoes of the state's attorney, and they have the power to make some decisions that actually create policy. At the very least, this is a textbook case for qualified immunity. The appellant's status as a policymaker is dispositive of both her free association and her free speech claims. This Court held in both Jenkins and in Bland v. Roberts that where an employee may be terminated for affiliating with an opposing candidate, the employee may also be terminated for campaign activity displaying that same political affiliation. And even if that were not the case, again on the free speech claim, this is a textbook case for qualified immunity. Starting with the free association claim, this Court has set forth a two-part test from the Stott case to determine whether an employee qualifies as a policymaker under the L. Rod Branty exception. The first step is, at a very high level of generality, is this the type of office where there could be room for political disagreement about things? And here, in terms of prioritizing cases in a state's attorney's office, as Judge Wilkinson was saying, or when to bring charges, when to enter into plea deals, at that first step, I think it's clear at a broad general level there's room for political disagreement. And then the second step is, based on the powers that are inherent in the office, does this position resemble a policymaker privy to confidential information? From my opposing point of view, it almost posits an assistant district attorney as being some sort of automaton or performing some sort of ministerial duties. And that's, you know, that's just not the case. The assistant district attorney possesses all kinds of discretion. It's not just a ministerial job, it's a job that requires all kinds of judgment. That's right, your honor. Judgment. That's right. And both as a matter of state law, the fact that the state's attorney may delegate his or her discretionary powers to an assistant state's attorney, and also the allegations in this particular complaint, as some of you were pointing out, make clear that the plaintiff here was exercising some of that discretion in terms of participating in charging decisions and acting as a community prosecutor, a liaison to the community for the state's attorney, the face of the state's attorney at these community meetings. Well, of course, if we were to get to the qualified immunity point, it's hard to say how they would not have qualified immunity given all the law that's out there. That's right, your honor. And given both their own law, but also all this law all across the country indicating that these are policy-making positions, but I don't know why, under Pearson v. Callahan, we have the discretion to say, no, wait a minute. There was no infringement of a constitutional right. We don't need to get to the qualified immunity point. That's right, your honor, and I think it could be useful for the state to have some clarity about the status of assistant state's attorneys under the LROD grantee exception. So I think it could make some sense for the court to exercise that discretion here and decide the constitutional question. But of course, if it also, this is a clear qualified immunity case, if it would like to go down that route. And to the qualified immunity point, this court had a decision, Clark v. Brown, that that assistant district attorney, I believe it was in West Virginia, it was not clearly established that that individual was a policymaker. And since that decision, it's only become more likely, given the case law and other circuits in here, that an assistant prosecutor would qualify as a policymaker. In your view, counsel, would there be any circumstance, and I guess for you, we would have to limit it to the state of Maryland, where an assistant district attorney would not fit within the LROD grantee classification? I think it's unlikely that there would be, because the test, as you look at the powers inherent in the office, and under state law, the cases we've cited in our brief explain that the state's attorney has the power to delegate his or her authority to any assistant state's attorney. So that means that at any time, any assistant state's attorney could be exercising the discretionary powers of the state's attorney, standing in the shoes. I ask that question, is that in our case law, dealing with deputy sheriffs, for instance, under Jenkins, we had a rule, but that was probably limited in that case, and certainly by later cases, to differentiate between deputy sheriffs that had law enforcement power, a road deputy, if you will, and jailers or bailiffs. So I guess I'm asking, and writing the rule for assistant district attorneys, would there be any limitations similar to deputy sheriffs? I'm not aware of any under Maryland law, Your Honor, that would be the same sort of sworn versus unsworn deputy sheriff's issue. You know, the assistant state's attorney under Maryland law can be delegated any of the powers of the state's attorney, stands in the shoes of the state's attorney whenever he or she Because the responsibilities that assistant prosecutors or assistant district attorneys exercise is remarkably common across the different states. There are different wrinkles in the state laws, but most, inherent in most of these positions is a discretion as to which cases to investigate, when to plead out a case, how to plead out a case, when to insist, you know, when to go on trial. All of those seem to be fairly common to assistant prosecutors throughout the country, regardless of what jurisdiction you find yourself in. These are not ministerial positions. They just aren't. They're filled by people with a great many public responsibilities, and that's why the Supreme Court differentiated between public defenders, who said, we're not policy makers, but it said, that's really different, the Supreme Court saying. A public defender office is really different from a prosecutor. Why? Because a prosecutor, an assistant prosecutor, not only bind the state, but is charged with a public responsibility of protecting the public, safeguarding in a fair manner, in trying to do justice, but safeguarding the public wheel and safeguarding the public interest. And it's hard to say that somebody who is vested with the responsibility of safeguarding the public interest is not somehow a policy maker. That just doesn't fit to me. I think that's right, and I think looking at the cases from the other courts of appeals that have dealt with this question, you're right, Judge Wilkinson, that the powers are of the board, those courts were relying on the same types of things that we have here. And I think it's also important to note that the, I mean, you're right that the, since these attorneys are exercising essentially police power of the state by assigning charging a way, shape, or form. And even if there were any question about that, as I mentioned earlier, if you look at the allegations in the complaint about how the plaintiff here, you know, takes great pride in the charging decisions, served as a community prosecutor or a liaison. Is there something that we've not touched on that you want to bring up? I do want to just mention on this issue of the, whether the free association and free association is intertwined when the employee is a policy maker. Well, if you decide that someone is a policy maker under Elrod Brant, that would have some weight in the Pickering balance, wouldn't it? It would, and in fact, this court, at least in the context. You said that. Yes, that's right. And at least in the context of where it's the speech at issue is campaign speech displaying the political affiliation, this court has said in Bland that it has a dispositive weight. And I do want to respond to the argument on the other side that Bland was just about political disloyalty to an incumbent official as opposed to a newly elected official coming in. Bland for that proposition relied on Jenkins. And in Jenkins, the situation was like the situation we have here, where a newly elected official came into office and dismissed employees who had campaigned in favor of that newly elected official's opponent in the election. And so the term political disloyalty, I think, was just using it as a shorthand for political affiliation with an opposing political candidate. And in fact, this court has said in Smith v. Fry that a newly elected official coming in and clearing Councilwoman, I think we understand your case. You've submitted, both of you submitted fine briefs, but I think we understand your case. Thank you. Thank you so much, Your Honor. Ms. Grigsby, you've reserved some time for rebuttal, and we'd be happy to hear from you. Thank you. Your Honors, understanding this court's concern about policymakers, just to note from the There is not a distinction between assistant state's attorneys who serve in the role of community prosecutors or any other assistant state's attorneys. I mean, this is an incredibly broad rule that's set forth. And for such a broad rule, in every other case, it has made it past the motion to dismiss stage, partially because the courts there at least wanted to understand what the specific responsibilities of the assistant prosecutors are. One thing that we touched upon, but didn't necessarily explore, which is how the pickering balance would be applied here. Again, obviously, there could be cases where the type of speech is so outrageous or so disloyal, it would be obvious that this person is disruptive and that the balance tips decidedly in the government's favor. But, in fact, many of the cases, even the cases cited by Ms. Mosby, show that pickering balance is balancing for policy officials, or even if you find a policy officials are appropriate. For example, in Bonds, the employee there was a supervisor in charge of block grants. The employee lost under pickering, not because he was a policymaker, which I think all sides conceded, but because of the fact that his speech was actually disruptive. And Barkert was an assistant to a municipal manager. There was no dispute that she was a confidential employee. Her speech concerned a potential violation of the Open Meeting Act. Again, the court found that the pickering balance weighed in her favor. And, in fact, in the 11th Circuit in Stoll, that actually held that an employee who campaigned for the opponent had a right to free speech, which outweighed the sheriff's interest in suppressing it. And there, the court found instructive the fact that the uncontradicted evidence demonstrates that immediately following the election and before Gallagher, there the sheriff, assumed office, Stoll assured Gallagher that he would be loyal, work harmoniously, and be fully supportive. By contrast, one of the cases that is cited, for example, Wilbur. It seemed to me that part of the burden of your argument was that we ought to wait in the pickering balance for some actual disruption to occur. And, but that would impose a managerial burden on its own. And implementing policy, it's sometimes done in different ways and in subtle ways. It doesn't always take policy differences between one or two prosecutors. Don't always take the form of an actual disruption. They say what they do is they just follow either subtly or non-overtly their own policy prerogatives. So I think that saying, well, you have to wait for actual disruption in the office to occur really not only imposes a managerial burden, but says, but overlooks the fact that a managerial burden is often something that's not the easiest thing in the world to detect. You see my concern with approaching the pickering balance in that way? Yes, Your Honor. The exception here, though, is that there's actual historical evidence from this particular office that assistant state's attorneys have stayed in the position, I mean, in two different administrations without incident. In fact, Ms. Mosby herself had done it. So in some cases, yes, it's true that there could be potential disruption because of some kind of disloyalty, which is kind of the fear in Elrod, which is that somehow political association might lead to poor performance. But that doesn't necessarily mean that that is the case. And it doesn't necessarily mean it's the case here where we know in the past that assistant state's attorneys have stayed employed through different state's attorneys and all have continued to perform their jobs. Finally, just as... What were all those individuals that you mentioned? Did they throw themselves... Yes. ...quite so vigorously into the election? Judge Wilkinson, Marilyn Mosby campaigned for Patricia Jessame. And in fact, there was a woman who was on a commercial for Patricia Jessame, and she stayed in the office as part of the due diligence. I've actually talked to Greg Bernstein, talked to Difference. All of those employees who actually took visible roles, state's assistants, state's attorneys, they continue to perform. They continue to do their job as any professional would. But it would be a matter of managerial prerogative to look at the different individuals and say, I think that this person could perform well in a policymaking role and overlook what happened before and then say, but I don't think this person could. I mean, that would be a managerial prerogative, wouldn't it be, to assess individuals and their capacity for loyalty to the incoming office order? Well, it could if the state's attorney actually believed that it was necessary to have this type of political association in order to perform the state's attorney's job. Again, in the past, Patricia Jessame and Greg Bernstein apparently did not think it was necessary and kept all of the state's attorneys. But again, on the record before us, I mean, all we know is that the assistant state's attorneys in the past had continued to remain employed, even those who spoke out in favor of the incumbent who then lost. And just finally, the district court did abuse its discretion in dismissing the state law claim under Article 40 with prejudice. The Supreme Court's been clear in United Mine Workers and then in Carnegie Mellon that when the court dismisses all the federal claims, then generally you relinquish jurisdiction over the case by dismissing it without prejudice, or you relinquish the jurisdiction over the case by remanding it to the state court. The court did neither here. It dismissed one of the Article 40 claims with prejudice, which is reversible error. And for all of these reasons, we request that you reverse the decision of the court below. Thank you. Thank you so much. We will come down to Greek Council and move directly into our next case.
judges: J. Harvie Wilkinson III, William B. Traxler, Jr., G. Steven Agee